# EXHIBIT B

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ERIE

_____

MEDAILLE COLLEGE
18 Agassiz Circle
Buffalo, New York  14214

                     Plaintiff,                        **SUMMONS**

    vs.

PVS CHEMICALS, INC.                          Index No. _____
10900 Harper Avenue
Detroit, Michigan  48213

      - and -

PVS CHEMICAL SOLUTIONS, INC.
10900 Harper Avenue
Detroit, Michigan  48213

                  Defendants.

_____

TO THE ABOVE NAMED DEFENDANTS:

        YOU ARE HEREBY SUMMONED to appear in this action and to serve a copy of your answers upon the attorneys for Plaintiff within 20 days after service of this summons, exclusive of this day of service, or within 30 days after service is complete if the summons is not personally delivered to you within the State of New York.  In case of your failure to answer or appear, judgment will be taken against you by default for the relief demanded in Plaintiff's Verified Complaint.

        Plaintiff designates Erie County as the place of trial.  Pursuant to CPLR 503(a), the basis for venue is Plaintiff's principal place of business.

DATED:     Buffalo, New York
           May 17, 2021

PHILLIPS LYTLE LLP

By _____

    Kenneth A. Manning
    John G. Schmidt Jr.
    Tristan D. Hujer
Attorneys for Plaintiff
*Medaille College*
One Canalside
125 Main Street
Buffalo, New York  14203-2887
Telephone No.:  (716) 847-8400
**kmanning@phillipslytle.com**

Doc #9689711

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ERIE

———————————————————————————

MEDAILLE COLLEGE,

                 Plaintiff,

    vs.

PVS CHEMICALS, INC. and
PVS CHEMICAL SOLUTIONS, INC.,

                 Defendants.

———————————————————————————

**VERIFIED COMPLAINT**

Index No. _____

Plaintiff Medaille College ("Medaille"), by and through its attorneys, Phillips Lytle LLP, alleges:

## NATURE OF ACTION

1.    This action seeks to remedy the nuisance and tortious conduct that has persisted for approximately two years as a result of the release of sulfur dioxide ("$SO_2$") from PVS' sulfuric acid manufacturing plant (the "PVS Plant") in Buffalo, New York, to a degree that exceeds national air quality standards and violates the Permit pursuant to which the New York State Department of Environmental Conservation ("NYSDEC") allows the PVS Plant to operate.

2.    Since 2019, when Medaille opened the multi-million-dollar Medaille College Sports Complex at Buffalo Color Park ("Sports Complex") adjacent to the PVS Plant, Medaille's students, personnel, and patrons have routinely experienced the foul smell of noxious emissions from the PVS Plant.  These odors and emissions have caused visitors to the Sports Complex to suffer adverse health effects such as eye irritation and respiratory discomfort.

3.      Defendants PVS Chemicals, Inc. and PVS Chemical Solutions, Inc. (together, "PVS") have refused to implement necessary upgrades to the PVS Plant to fix the problem of excessive $SO_2$ emissions and bring the Plant into compliance with its Permit.

4.      This has caused air quality around the PVS Plant and the Sports Complex to deteriorate so much that, on May 14, 2021, NYSDEC demanded that the PVS Plant shut down ongoing operations, unless and until PVS is able to undertake operational modifications and/or production level reductions to operate in a manner that does not exceed the Acute Exposure Guideline Levels ("AEGLs") for $SO_2$ and does not otherwise cause or contribute to air pollution related to $SO_2$ emissions.

5.      PVS has announced publicly that they will not comply with NYSDEC's demand.

6.      Meanwhile, Medaille, its students, and its sublessees continue to suffer the consequences of PVS' recalcitrance.  Because PVS refuses to pause the PVS Plant's operations, the New York State Department of Health (the "DOH") has asked Medaille to suspend activities at the Sports Complex until such time that the environmental hazards created by the PVS Plant's excessive $SO_2$ emissions can be mitigated.

7.      This amounts to throwing the victim in jail while the perpetrator continues on its crime spree.

8.      The actions of the DOH has forced and will force the postponement or cancellation of long-scheduled events at the Sports Complex, and the loss of revenue to Medaille, without addressing the cause of the PVS Plant's $SO_2$ emissions that violate the PVS Plant's Permit, exceed what air quality standards allows, and compromise the use and enjoyment of the Sports Complex.

2

9.      Medaille seeks monetary damages to remedy this ongoing nuisance, and injunctive relief to require PVS to do what they will not do in response to NYSDEC: pause the PVS Plant's operations until the PVS Plant can operate safely in compliance with its Permit, without endangering the health and safety of Medaille's students, personnel, and visitors using the Sports Complex.

## PARTIES, JURISDICTION, AND VENUE

10.     Medaille is a corporation organized pursuant to the New York State Not-for-Profit Corporation Law for educational purposes.  It is a private, nonsectarian four-year college that offers both undergraduate and graduate degree programs, and enrolls more than 2,000 students.

11.     Medaille operates under an absolute Charter authorized by the University of the State of New York Board of Regents.  Medaille's principal office is located at 18 Agassiz Circle, Buffalo, New York.

12.     Medaille also rents from South Buffalo Development, LLC, certain real property--the Sports Complex, located at 427 Elk Street, Buffalo, New York.

13.     PVS Chemicals, Inc. and PVS Chemical Solutions, Inc. are foreign "profit corporations" organized under the laws of the State of Michigan.  PVS maintains its principal place of business at 10900 Harper Avenue, Detroit, Michigan.

14.     PVS operates the chemical manufacturing Plant, located at 55 Lee Street, Buffalo, New York.  At the PVS Plant, PVS manufactures a variety of chemicals, most prominently sulfuric acid, used in a variety of industrial applications.

15.     The Plant and the Sports Complex are adjacent to, and situated approximately 100 yards away from, each other.

16.     Jurisdiction is proper in this Court, because this action seeks injunctive relief and monetary damages against PVS, to remedy PVS' tortious conduct that has compromised the use, availability, and enjoyment of the Sports Complex by Medaille, and its students, has created health risks, and has interfered with Medaille's prospective business opportunities.

17.     Venue is proper in Erie County, where Medaille maintains its principal place of business.

## FACTUAL BACKGROUND

### A.     The Sports Complex

18.     Medaille completed the first phase of the Sports Complex in the winter of 2019.

19.     This first phase consists of a soccer and lacrosse field with nearly 100,000 square feet of 2.5-inch-thick artificial turf, bleachers for up to 500 spectators, a scoreboard, press box, lighting for night games, and a 20,000-square-foot athletics administration building that comprises six locker rooms, two classrooms, an office, athletic trainers' treatment space, storage space, a concession stand, and strength and conditioning facilities.

20.     A second phase of the Sports Complex is intended to add a baseball diamond, two softball diamonds, four dugouts, two batting cages, additional press boxes and scoreboards, and a multipurpose field, again with lighting for night games.

21.     The Sports Complex is the practice and competition home of Medaille's men's and women's soccer, men's and women's lacrosse, and women's field hockey teams.  Medaille's men's baseball and women's softball teams also use the Sports

4

Complex for practice.  In addition, as a means of earning income to fund the Sports Complex's operations, Medaille has also made the Sports Complex available for rent by athletic organizations and community groups separate from Medaille.

22.     Anyone can request to rent the Sports Complex by completing a rental form available on Medaille's website at https://www.medaille.edu/my-medaille/sports-complex-facilities-rental-form.

**B.     The PVS Plant**

23.     Having operated since at least 1981, the PVS Plant manufactures sulfuric acid and fuming sulfuric acid (also known as oleum) via the "contact process."

24.     One stage of the contact process produces $SO_2$ ($SO_2$) as an intermediate product.  Specifically, the Plant generates $SO_2$ by thermally decomposing spent sulfuric acid or burning elemental sulfur in the presence of excess oxygen and catalytically converting $SO_2$ to sulfur trioxide, which is then absorbed in strong sulfuric acid to produce saleable commercial grades of sulfuric acid and oleum.

25.     The contact process can result in the release of $SO_2$ into the air surrounding the PVS Plant and the adjacent Sports Complex.

26.     $SO_2$ is a toxic gas that produces a noxious odor, akin to burning matches.

27.     When one inhales $SO_2$ fumes that are present in the air in a high concentration, one can sustain irritation to the eyes and respiratory system.

28.     National Ambient Air Quality Standards ("NAAQS") list air pollutants, such as $SO_2$ and other chemicals harmful to public health and the environment, and set air quality requirements with respect to the same.

Case 1:21-cv-00662-JLS   Document 1-2   Filed 05/23/21   Page 9 of 64

29.     The NAAQS sets the primary air quality standard with respect to $SO_2$ concentration at 75 parts per billion ("ppb"), which is the 99th percentile of daily maximum one-hour $SO_2$ concentrations, averaged over three years.

30.     The State of New York ensures satisfaction of the NAAQS standard for $SO_2$ pursuant to a state implementation plan ("SIP").

31.     The State authorizes the PVS Plant to operate pursuant to a Title V Air Permit that took effect on October 2, 2017, and expires October 1, 2022 (the "Permit").

32.     Consistent with its obligations under the SIP, the State has expressly required PVS in its Permit to limit $SO_2$ emissions from the PVS Plant to prevent a concentration of $SO_2$ that exceeds the NAAQS standard.

33.     Toward this end, the Permit mandates PVS to monitor, measure, and record hourly the concentration of $SO_2$ emissions observed at several locations around the PVS Plant.

34.     PVS must keep a written log of these measurements for at least five years, and make it available for inspection by personnel of NYSDEC at any time upon request.

## C.     Health and safety complaints from users of the Sports Complex reveal PVS's non-compliance with the Permit with respect to $SO_2$ emissions

35.     Since Medaille's personnel and students and community members began using the Sports Complex in the spring of 2019, they and the Sports Complex's owner have reported numerous complaints to Medaille and to NYSDEC about odors and smoke, emanating from the PVS Plant, that caused them to suffer, among other things, respiratory and eye irritations, and a "bad taste" in their mouths.

6

36.     On several occasions, the smoke emanating from the PVS Plant has caused a fog to hover over the Sports Complex, thereby making participation in outdoor games and practices at the Sports Complex extremely difficult because of the foul smell and adverse impact on vision and breathing among athletes, coaches, and spectators.

37.     As a result of the complaints from users of the Sports Complex about the odors and smoke emitted by the PVS Plant and the resulting detriment to their health and enjoyment of the Sports Complex's amenities, NYSDEC commenced ambient air sampling at the PVS Plant on an hourly basis on or about July 10, 2020.

38.     From July 10, 2020, through October 18, 2020, NYSDEC detected at least 70 exceedances of the one-hour $SO_2$ NAAQS of 75 ppb from the PVS Plant.

39.     Prior monitoring conducted on behalf of Medaille also demonstrated this egregious level of improper emissions of $SO_2$.

40.     This meant the PVS Plant operated in exceedance of the $SO_2$ NAAQS standard on 69% of the days monitored by NYSDEC.

41.     From July through October 2020, NYSDEC also identified several $SO_2$ leaks on the premises of the PVS Plant.

42.     With the Huntley Steam Generating Station and the Tonawanda Coke Corporation plant having closed in 2019, NYSDEC now recognizes the PVS Plant as the only stationary source of $SO_2$ exceedances in all of Erie County, with the maximum impact of those exceedances most likely to be noticed around the Sports Complex and other areas immediately surrounding the PVS Plant.

43.     Indeed, NYSDEC's own monitoring devices have detected $SO_2$ emissions attributable to the PVS Plant on 55 days from September 2, 2020, through

7

February 28, 2021.  On many of these days, NYSDEC's own staff could smell a sulfuric odor emanating from the PVS Plant.

44.     In response, on March 13, 2021, NYSDEC commenced an administrative proceeding seeking, among other things, an Order determining that PVS had violated the terms of its Permit to operate the PVS Plant, and requiring PVS to implement a number of corrective actions, such as: (i) development of plans and upgrades in technology to mitigate odors and control emissions from the PVS Plant, (ii) implementation of enhanced monitoring for $SO_2$ emissions, and (iii) remediation of the leaks that have contributed to those emissions.  **Exhibit A** is a copy of the NYSDEC's Notice of Hearing and Verified Complaint.

### D.     $SO_2$ emissions worsen at the PVS Plant, and Medaille and its students suffer the consequences

45.     On or about March 31, 2021, again in response to the continued complaints about smoke and noxious odors emanating from the PVS Plant, NYSDEC once again deployed an ambient air monitoring station to the PVS Plant.

46.     Over the past month and a half, NYSDEC has again detected numerous exceedances of the NAAQS standard for $SO_2$ in the air around the PVS Plant.

47.     In addition, having reviewed data collected from ambient air monitoring around the PVS Plant in 2020 and 2021, the New York State Department of Health ("DOH") has identified numerous instances when $SO_2$ concentrations exceeded the Acute Exposure Guideline Levels ("AEGLs") set by the National Academy of Sciences, thereby demonstrating a potential for individuals at the Sports Complex to sustain severe respiratory effects.

Case 1:21-cv-00662-JLS   Document 1-2   Filed 05/23/21   Page 12 of 64

48.     According to NYSDEC and the DOH in a letter dated May 14, 2021, from NYSDEC Deputy Commissioner General Counsel Thomas Berkman, Esq., to PVS Plant Manager Robert Davis,

> [t]he number and duration of these unhealthy air episodes [caused by the operation of the PVS Plant] is of particular risk to exercising individuals and to other vulnerable groups including asthmatics.  This indicates that symptoms of irritation, reduced lung function and respiratory distress can be expected for these and other individuals not in the vulnerable groups at the detected concentrations.  This finding is consistent with the reported complaints received by DEC from those using the nearby [Sports Complex].

**Exhibit B**.

49.     For these reasons, NYSDEC demanded that PVS "immediately cease and desist ongoing operations" at the PVS Plant, "unless and until the facility is able to undertake operational modifications and/or production level reductions to operate in a manner that does not violate the Acute Exposure Guideline Levels ("AEGLs") for $SO_2$ ($SO_2$) and does not otherwise cause or contribute to air pollution related to $SO_2$ emissions that may cause a risk to human health."  *Id.*

50.     In response, PVS has refused to comply with demand.  **Exhibit C** is a copy of an article entitled, "Buffalo chemical plant says state shutdown order 'is not justified,'" by Dale Anderson and published on www.buffalonews.com on May 15, 2021.

51.     This article quotes a media statement issued by PVS on May 15, 2021, in which PVS announces its "complete disagreement" with the cease-and-desist letter (Exhibit B), and that it would not shut down the PVS Plant, but rather merely "*tone down operations* while [PVS] work[s] with the DEC through the courts to remedy this situation" (emphasis added). Exhibit C.

9

52.     Meanwhile, Medaille, its students, and tenants planning to use the Sports Complex suffer the consequences of PVS' recalcitrance and persistent failure to control the PVS Plant's emissions of $SO_2$.

53.     With PVS refusing to shut down the PVS Plant in response to NYSDEC's cease-and-desist letter, the DOH sent Kenneth M. Macur, the President of Medaille, a letter dated May 15, 2021, in which the DOH "request[s] that all activities at the [Sports Complex], administered by Medaille College, be suspended and the fields secured to prevent further use, effective immediately," because "continued use" of the Sports Complex "constitutes a danger to the health of the people . . . and must be suspended until such time as all hazards can be mitigated."  **Exhibit D** is a copy of this letter.)

54.     This could be so for only one reason: because of the excessive $SO_2$ emissions caused by the PVS Plant's continued operation and PVS' refusal of NYSDEC's shutdown demand to fix the problem.

55.     Because of the DOH's letter (**Exhibit <u>D</u>**), arising from PVS' refusal to shut down the PVS Plant in response to NYSDEC's cease-and-desist letter, Medaille has been forced to postpone or cancel several athletic events scheduled to take place at the Sports Complex during the week of May 16, 2021.

56.     In addition, absent a permanent reduction of the PVS Plant's $SO_2$ emissions to levels that comply with its Permit, Medaille's personnel and students and other patrons of the Sports Complex will continue to smell noxious sulfuric odors, observe smoke and fog wafting from the PVS Plant, and sustain adverse health effects that will severely compromise their use and enjoyment of the Sports Complex.

57.    The PVS Plant's continued operation also has caused Medaille to lose prospective business opportunities from organizations that previously desired to pay Medaille to use the Sports Complex.

58.    For example, in 2019, Medaille had a tentative agreement with Global Premier Soccer, an organization that sponsored youth soccer leagues in Western New York, by which Global Premier Soccer would pay Medaille $560,000, including $230,000 up front, to use the Sports Complex over the course of several years.

59.    Global Premier Soccer backed out of this tentative agreement, however, and advised Medaille that it did so because of parents' concern about elevated $SO_2$ emissions from the PVS Plant and potential adverse health effects among the children who would play there.

60.    Medaille requires this Court's intervention to remedy the irreparable harm that Medaille and its personnel, students, and patrons have sustained and will continue to sustain as a result of the PVS Plant's $SO_2$ emissions, to compensate Medaille's damages, and to enjoin and restrain the PVS Plant's emissions in violation of the requirements of its Permit.

### FIRST CAUSE OF ACTION
#### (Private Nuisance)

61.    Plaintiff realleges paragraphs 1 through 60.

62.    A private nuisance is an interference that is substantial in nature, intentional in origin, unreasonable in character, with one's property right to use and enjoy land, whereby such interference was caused by another's actions or failure to act.

63.    PVS vociferously opposed development of the Sports Complex when Medaille proposed it.

11

64. Even so, Medaille duly received all necessary land-use approvals from the City of Buffalo to authorize construction and operation of its Sports Complex adjacent to the PVS Plant.

65. As a neighbor to Medaille's Sports Complex, PVS has a duty to Medaille and the general public to comply with the requirements of the PVS Plant's Permit, which prohibits $SO_2$ emissions that exceed the one-hour NAAQS standard of 75 ppb.

66. Since at least when the Sports Complex opened in 2019, PVS has consistently breached that duty.

67. The operation of the PVS Plant has substantially interfered with the use and enjoyment of the Sports Complex by Medaille and its students, personnel, and patrons since the spring of 2019, in that the PVS Plant has routinely released $SO_2$ to a degree that violates the PVS Plant's Permit, and causes concentration of $SO_2$ in the air surrounding the PVS Plant and the Sports Complex to exceed the NAAQS standard.

68. This interference is manifest in, among other things, (i) the foul sulfuric odor and smoke pollution often experienced by users of the Sports Complex, (ii) the consistent complaints made to NYSDEC, (iii) Medaille's air monitoring reflecting repeated and ongoing excessive SO2 emissions, and (iv) NYSDEC's own ambient air monitoring reflecting at least 70 exceedances of the one-hour SO2 NAAQS of 75 ppb from the PVS Plant in a 101-day period in 2020, and additional such exceedances in the spring of 2021.

69. This interference has been unreasonable, in that it has (i) caused students, personnel, and patrons using the Sports Complex to experience adverse health effects, including but not limited to eye irritations and respiratory problems, and thereby has adversely affected their ability to use and enjoy the Sports Complex, (ii) interfered with the

property rights and quite enjoyment of the Sports Complex by Medaille, and (iii) damaged the good will and reputation of Medaille and the Sports Complex.

70.     PVS's interference has been intentional, malicious, and/or utterly reckless, in that, even though PVS has known that its Plant routinely releases emissions that exceed the $SO_2$ NAAQS standard, violate its Permit, and cause the noxious odors, smoke pollution, and adverse health effects reported by users of the Sports Complex, PVS continues to operate the PVS Plant while refusing to perform upgrades necessary to remediate its $SO_2$ emissions problems and comply with its Permit.

71.     This interference continues today, as demonstrated by the DOH's request on May 15, 2021, that Medaille immediately suspend and cancel long-scheduled activities at the Sports Complex until the elevated $SO_2$ concentrations caused by emissions from the PVS Plant are mitigated.

72.     Notwithstanding these excessive $SO_2$ concentrations that violate the PVS Plant's Permit, PVS has refused NYSDEC's demand in the cease-and-desist letter dated May 14, 2021, that PVS temporarily shut down its Plant.

73.     The private nuisance created by the operation of the PVS Plant in violation of its Permit and in persistent exceedance of the one-hour SO2 NAAQS standard of 75 ppb has caused Medaille to sustain irreparable harm, plus monetary damages, including but not limited to a reduction in the value of the Sports Complex; unpaid compensation for interruptions in the availability of the Sports Complex for use by Medaille and others that contract with Medaille for the same; and lost rentals of the Sports Complex by organizations that would desire to use the Sports Complex, but for the elevated SO2 emissions from the PVS Plant.

13

74. The private nuisance also qualifies Medaille for an award of punitive damages, because it is the product of PVS' intentional, malicious, and/or utterly reckless misconduct and omissions.

75. Medaille is entitled to an Order and Judgment awarding compensatory and punitive damages to remedy the private nuisance caused by the operation of the PVS Plant in violation of its Permit and in persistent exceedance of the SO2 NAAQS standard.

## SECOND CAUSE OF ACTION
### (Public Nuisance)

76. Plaintiff repeats paragraphs 1 through 75.

77. A public nuisance refers to conduct that substantially interferes with a common right of the public, thereby offending public morals; interfering with the public's use of a public place; or endangering or injuring the property, health, safety, or comfort of a considerable number of persons.

78. In routinely releasing $SO_2$ to a degree that violates the PVS Plant's Permit, and causes concentration of $SO_2$ in the air surrounding the PVS Plant and the Sports Complex to exceed the one-hour NAAQS standard of 75 ppb, PVS has substantially interfered with the rights of Medaille and its students, personnel, patrons, and visitors from the public to use and enjoy the Sports Complex.

79. This substantial interference has caused persons using the Sports Complex to report numerous complaints to NYSDEC about noxious odors and smoke pollution emanating from the PVS Plant, and their role in causing athletes and visitors to experience adverse health effects, such as eye irritations and respiratory problems.

80. This substantial interference also has compromised the ability of Medaille and its students, personnel, and patrons to use the Sports Complex, as exemplified

by the DOH's request on May 15, 2021, that Medaille immediately suspend and cancel long-scheduled activities at the Sports Complex until the elevated $SO_2$ concentrations caused by emissions from the PVS Plant can be mitigated. This is a special injury to Medaille, beyond the injury sustained by the community at large.

81.    Medaille is entitled to an Order and Judgment awarding compensatory and punitive damages to remedy the public nuisance caused by the operation of the PVS Plant in violation of its Permit and the SO2 NAAQS standard.

### THIRD CAUSE OF ACTION
**(Trespass)**

82.    Plaintiff repeats paragraphs 1 through 81.

83.    A trespass is an intentional entry onto the land of another without permission.

84.    Since the spring of 2019, PVS has known that its Plant routinely releases emissions that exceed the one-hour SO2 NAAQS standard of 75 ppb, violate its Permit, and cause visible smoke pollution.

85.    PVS knew its improper emissions would, and did, immediately and inevitably drift into the air above the adjacent Sports Complex.

86.    Indeed, users of the Sports Complex routinely observed these improper emissions, consisting of excessive $SO_2$ emissions, as they and Medaille reported in numerous complaints to NYSDEC.

87.    Even so, PVS continued to operate the PVS Plant while refusing to perform upgrades necessary to remedy its $SO_2$ emissions problems and comply with its Permit.

15

88.     In routinely releasing $SO_2$ to a degree that violates the PVS Permit, and causes concentration of $SO_2$ in the air surrounding the PVS Plant and the Sports Complex to exceed the one-hour NAAQS standard of 75 ppb, the PVS Plant operation has produced smoke pollution that has substantially interfered with the rights of Medaille and its students, personnel, patrons, and visitors from the public to use and enjoy the Sports Complex; and has caused users of the Sports Complex to experience adverse health effects that include eye irritations and respiratory problems.

89.     Medaille is entitled to an Order and Judgment awarding compensatory and punitive damages to remedy the smoke pollution trespass caused by the operation of the PVS Plant in violation of its Permit and in persistent exceedance of the $SO_2$ NAAQS standard.

### FOURTH CAUSE OF ACTION
**(Negligence)**

90.     Plaintiff repeats paragraphs 1 through 89.

91.     Negligence consists of a defendant's breach of a duty owed to the plaintiff, that causes the plaintiff to sustain damages.

92.     As described herein, PVS routinely breached its duty to Medaille to comply with the requirements of Permit to operate the PVS Plant, by knowing that it releases $SO_2$ emissions that exceed the one-hour NAAQS standard of 75 ppb, but refusing and/or failing to make upgrades necessary to fix the problem.

93.     This circumstance is the proximate cause of: (i) the foul sulfuric odor and smoke pollution often perceived by users of the Sports Complex; (ii) the consistent complaints made about the same to NYSDEC; (iii) NYSDEC's own ambient air monitoring reflecting at least 70 exceedances of the one-hour $SO_2$ NAAQS of 75 ppb from the PVS

16

Plant in a 101-day period in 2020, and additional such exceedances in the spring of 2021; and (iv) the adverse health effects, including but not limited to eye irritations and respiratory problems, that users of the Sports Complex have experienced and that have adversely affected their ability to use and enjoy the Sports Complex.

94.     As a result, Medaille has sustained monetary damages, including but not limited to a reduction in the value of the Sports Complex; unpaid compensation for interruptions in the availability of the Sports Complex for use by Medaille and others that contract with Medaille for the same; and lost rentals of the Sports Complex by organizations that would desire to use the Sports Complex, but for the elevated SO2 emissions from the PVS Plant.

95.     Medaille is entitled to an Order and Judgment awarding compensatory and punitive damages to remedy PVS' negligence.

## FIFTH CAUSE OF ACTION
**(Tortious Interference with Prospective Business Relations or Economic Advantage)**

96.     Plaintiff repeats paragraphs 1 through 95.

97.     A defendant is liable to the plaintiff for its wrongful conduct that interferes with the plaintiff's prospective business relations or economic advantage.

98.     Since the Sports Complex was proposed, PVS knew that Medaille intended to rent it for a fee to others that desired to use it for athletic events.

99.     Even so, PVS continued to release $SO_2$ from the PVS Plant to a degree that violates PVS's Permit, and causes concentration of $SO_2$ in the air surrounding the PVS Plant and the Sports Complex to exceed the one-hour NAAQS standard of 75 ppb.

100.     PVS has known this circumstance would cause a foul sulfuric odor and visible smoke pollution to drift into the air above the adjacent Sports Complex and

adversely affect the use and enjoyment of the same by Medaille and its students, personnel, and patrons. Yet PVS continues to operate the PVS Plant while refusing to perform upgrades necessary to remediate its $SO_2$ emissions problems and comply with its Permit.

101.    PVS's wrongful conduct has caused several organizations that otherwise planned to contract with Medaille to use the Sports Complex for payment of a fee to decide against doing so, because of concerns that $SO_2$ emissions exceeding those authorized by PVS's Permit would adversely impact the health of athletes and visitors at the Sports Complex.

102.    For example, these concerns caused Global Premier Soccer to abandon a contractual relationship to which it had agreed with Medaille in principle, and that would have paid Medaille $560,000, including $230,000 up front, for use of the Sports Complex over the course of several years.

103.    Medaille is entitled to an Order and Judgment awarding monetary damages to compensate PVS' tortious interference with Medaille's prospective business relations or economic advantage.

### SIXTH CAUSE OF ACTION
**(Declaratory Judgment, Temporary Restraining Order, Preliminary Injunction, and Permanent Injunction)**

104.    Plaintiff repeats paragraphs 1 through 103.

105.    On May 15, 2021, the DOH requested that Medaille suspend all activities at the Sports Complex and secure the premises "to prevent further use, effective immediately," because "continued use" of the Sports Complex "constitutes a danger to the health of the people," absent mitigation of the environmental hazards presented by PVS's

18

continued release of $SO_2$ emissions to a degree that violates its Permit and exceeds the one-hour SO2 NAAQS standard of 75 ppb.

106.   This demonstrates how Medaille is the innocent victim of PVS' recalcitrant refusal: (i) to perform the upgrades necessary to fix the $SO_2$ emissions problem at the PVS Plant and (ii) to shut down the PVS Plant's operations in response to the cease-and-desist letter it received from NYSDEC on May 14, 2021.

107.   Such circumstance causes Medaille to sustain irreparable harm, including but not limited to: (i) the noxious sulfuric odor, smoke pollution, and adverse health effects (such as eye irritations and respiratory problems) experienced by Medaille's students, personnel, and patrons using the Sports Complex; (ii) interruptions in its ability to use the Sports Complex, (iii) lost opportunities to do business with organizations that would otherwise desire to use the Sports Complex, but for their concerns about excessive $SO_2$ emissions from the PVS Plant; (iv) a loss of good will and harm to reputation caused by the excessive $SO_2$ emissions; and now, (iv) as a result of the DOH letter and to avoid future harm, the postponement and/or cancellation of long-scheduled athletic events at the Sports Complex and the Sports Complex's shutdown for an unknown period of time.

108.   Medaille has no adequate legal remedy for these irreparable harms, which are in addition to the economic damages detailed above.

109.   The equities balance in favor of Medaille, because these irreparable harms are the proximate cause of PVS's persistent violation of its Permit ever since the Sports Complex opened.  PVS's interests in maintaining the PVS Plant's business do not justify allowing PVS to keep releasing $SO_2$ emissions to a degree that violates its Permit and

Case 1:21-cv-00662-JLS   Document 1-2   Filed 05/23/21   Page 23 of 64

jeopardizes the Sports Complex's safe operation and the health of Medaille's students, personnel, and Complex patrons.

110.   Medaille is entitled to an Order and Judgment:

(1)   declaring that PVS is prohibited from continuing its excessive emissions of $SO_2$ above the one-hour NAAQS standard of 75 ppb (the "Excessive Emissions") unless and until PVS demonstrates that it can and will permanently stop producing exceedances beyond 75 ppb of $SO_2$ in the air at the Sports Complex and surrounding Seneca Babcock Community ("$SO_2$ Exceedances") and prevent the same from entering the air at the Sports Complex and surrounding Seneca Babcock Community; and

(2)   preliminarily and permanently enjoining and restraining PVS, its agents, partners, employees, representatives, lessees, sublessees, and assigns, and all persons, partnerships, companies and corporations acting with them, or pursuant to their direction (together, also defined as "PVS"): (i) from causing or allowing Excessive Emissions to enter the Sports Complex and surrounding Seneca Babcock Community, such that, at all times, there shall be no $SO_2$ Exceedances; and/or, (ii) consistent with NYSDEC's demand on May 14, 2021, from engaging in ongoing operations of the PVS Plant, unless and until PVS is able to undertake operational modifications and/or production level reductions to operate in a manner that does not violate the Acute Exposure Guideline Levels for $SO_2$ and does not otherwise cause or

20

contribute to air pollution related to $SO_2$ emissions that may cause a risk to human health.

WHEREFORE, Medaille demands an Order and Judgment against PVS as follows:

A.    On Medaille's First, Second, Third, and Fourth Causes of Action, awarding compensatory and punitive damages in an amount to be determined at trial;

B.    On Medaille's Fifth Cause of Action, awarding compensatory damages in an amount to be determined at trial;

C.    On Medaille's Sixth Cause of Action, an Order and Judgment:

(1)    declaring that PVS is prohibited from continuing the Excessive Emissions unless and until PVS demonstrates that it can and will permanently stop producing the $SO_2$ Exceedances and prevent the same from entering the air at the Sports Complex and surrounding Seneca Babcock Community; and

(2)    preliminarily and permanently enjoining and restraining PVS: (i) from causing or allowing Excessive Emissions to enter the Sports Complex and surrounding Seneca Babcock Community, such that, at all times, there shall be no $SO_2$ Exceedances; and/or, (ii) consistent with NYSDEC's demand on May 14, 2021, from engaging in ongoing operations of the PVS Plant, unless and until PVS is able to undertake operational modifications and/or production level reductions to operate in a manner that does not violate the Acute Exposure Guideline Levels for $SO_2$ and does not otherwise cause or contribute to

21

air pollution related to $SO_2$ emissions that may cause a risk to human health; and

D.  Awarding Medaille its Court costs, disbursements, and attorneys' fees, plus interest; and

E.  Awarding such other and further relief as this Court deems just and proper.

DATED:  Buffalo, New York
        May 17, 2021

PHILLIPS LYTLE LLP

By _____
    Kenneth A. Manning
    John G. Schmidt Jr.
    Tristan D. Hujer
Attorneys for Plaintiff
*Medaille College*
One Canalside
125 Main Street
Buffalo, New York  14203-2887
Telephone No. (716) 847-8400
**kmanning@phillipslytle.com**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ERIE

_____

MEDAILLE COLLEGE,

                Plaintiff,                              **VERIFICATION**

vs.

PVS CHEMICALS, INC.; and                Index No. _____
PVS CHEMICAL SOLUTIONS, INC.,

                Defendants.

_____

STATE OF NEW YORK  )
                        ) ss:
COUNTY OF ERIE       )

           KENNETH M. MACUR, Ph.D., being duly sworn, deposes and states that

he is the President of Medaille College, the Plaintiff in this action; that he has read the

foregoing Verified Complaint and knows the contents thereof; that the same is true to his

own knowledge, except as to the matters therein stated to be alleged upon information and

belief, and as to those matters he believes it to be true; and that he is acquainted with the

facts alleged in the foregoing Verified Complaint.

                                    _____
                                    KENNETH M. MACUR, Ph.D.

Sworn to before me this
17th day of May, 2021.

_____
           Notary Public

Doc #9689712.1

JOHN G. SCHMIDT
Notary Public, State of New York
Qualified in Erie County
My Commission Expires 10/07/2022

23

# EXHIBIT

# A

STATE OF NEW YORK
DEPARTMENT OF ENVIRONMENTAL CONSERVATION

_____

In the Matter of the Violations of Article 19 of the
Environmental Conservation Law and Parts 200 and 201
of Title 6 of the New York Codes, Rules and Regulations

**NOTICE OF
HEARING**

File No. 20-40
R9-20201020-149

-By-

PVS Chemical Solutions, Inc.,
Respondent

_____

**PLEASE TAKE NOTICE THAT**, pursuant to Article 3 of the State Administrative
Procedure Act, the above captioned sections of the New York State Environmental
Conservation Law ("ECL"), and Part 622 of Title 6 of the Official Compilation of Codes,
Rules and Regulations of the State of New York ("6 NYCRR"), the undersigned shall
request of the Chief Administrative Law Judge ("ALJ") of the Office of Hearings and
Mediation Services of the New York State Department of Environmental Conservation
("Department") that an adjudicatory hearing be convened at the Department's Region 9
office, located at 270 Michigan Avenue, Buffalo, New York, on such a day or days as
the Chief ALJ, or the ALJ assigned by him to this matter, may fix in order to consider
certain allegations that PVS Chemical Solutions, Inc. has violated Article 19 of the ECL
and 6 NYCRR 200 and 201 as more specifically set forth in the attached Complaint, to
consider assessment of penalties as warranted, and further, to consider any other or
additional remedial or corrective action which may be appropriate.

**PLEASE TAKE FURTHER NOTICE THAT** the above-mentioned hearing date
will be set by the Office of Hearings and Mediation Services upon the filing of a
Statement of Readiness for adjudicatory hearing pursuant to 6 NYCRR 622.9 with the
Chief ALJ.

**PLEASE TAKE FURTHER NOTICE THAT** this Notice of Hearing serves as
notice for any days the Office of Hearings and Mediation Services may fix for said
hearing, or any adjournments or continuances thereof.

**PLEASE TAKE FURTHER NOTICE THAT**, pursuant to 6 NYCRR 622.4, PVS
Chemical Solutions, Inc. must file a written answer to the violations alleged within
twenty (20) days of receipt of the Complaint, annexed hereto. The written answer shall
specify which allegations the corporation admits, which allegations are denied, and
which allegations the corporation has insufficient information upon which to form an
opinion regarding the allegation. The written answer shall be filed with the Department
by serving same, by mail, upon the Department attorney who has signed this Notice of

Hearing, and signed by Respondent, the Respondent's attorney or other authorized representative.

**PLEASE TAKE FURTHER NOTICE THAT** any affirmative defenses, including, but not limited to, defense(s) of exemption(s) from permitting requirement(s), shall be waived unless they are specifically raised as affirmative defense(s) in any answer filed in this proceeding. Any affirmative defense(s) raised must include a statement of the facts which constitute the grounds of each affirmative defense asserted.

**PLEASE TAKE FURTHER NOTICE THAT** if PVS Chemical Solutions, Inc. fails to serve a timely answer in this matter, pursuant to 6 NYCRR 622.4, or even if a timely answer is filed and the corporation fails to appear at the adjudicatory hearing in this matter, such failure will result in a default and waiver of PVS Chemical Solutions, Inc.'s right to a hearing; and, pursuant to 6 NYCRR 622.15, an Order may be issued against the corporation granting the relief requested in the attached Complaint. **PVS CHEMICAL SOLUTIONS, INC. MAY NOT RECEIVE ANY FURTHER NOTICE OF ANY ACTION THAT MAY BE TAKEN IN THIS REGARD.**

**PLEASE TAKE FURTHER NOTICE THAT** this proceeding is governed by the procedures delineated in 6 NYCRR 622, which provides for various forms of relief which PVS Chemical Solutions, Inc. may request by motion made pursuant to the general rules of practice provided therein. If PVS Chemical Solutions, Inc. wishes to make a motion for any of the relief provided in 6 NYCRR 622, such motion must be made to the Chief ALJ of the Department at the following address:

Chief Administrative Law Judge
Office of Hearings and Mediation Services
New York State Department of Environmental Conservation
625 Broadway, 1st Floor
Albany, New York 12233-1550

Any such motion made by the corporation must also be served, by mail, upon the Department attorney who has signed this Notice of Hearing. Moreover, if PVS Chemical Solutions, Inc. is served by the Department with a motion for any relief requested by them, the corporation must file its response to any said motion with the Chief ALJ, at the above address, as well as upon the Department attorney who has signed this Notice of Hearing.

**PLEASE TAKE FURTHER NOTICE THAT** ECL 71-2103 provides that any person who violates Article 19 of the ECL, or any rule or regulation promulgated thereto, shall be liable for a civil penalty of up to $18,000 for each violation and an additional penalty not to exceed $15,000 for each day that the violation continues. In the case of a second or any further violation, the liability shall be for a penalty not to exceed $26,000 for said violation and an additional penalty not to exceed $22,500 for each day during which such violation continues.

FILED: ERIE COUNTY CLERK 05/17/2021 12:31 PM
NYSCEF DOC. NO. 2    Case 1:21-cv-00662-JLS   Document 1-2   Filed 05/23/21   Page 30 of 64

INDEX NO. 806451/2021

RECEIVED NYSCEF: 05/17/2021

**PLEASE TAKE FURTHER NOTICE THAT** whether or not PVS Chemical Solutions, Inc. appears, the hearing will be convened at the time and place set by the ALJ, and should the violations of law be established, an Order may be issued against the corporation, including the assessment of penalties or any other or additional remedial or corrective action which may be appropriate. PVS Chemical Solutions Inc. may waive its right to a public hearing and agree to the issuance of an Order on Consent.

**PLEASE TAKE FURTHER NOTICE THAT** PVS Chemical Solutions, Inc. may appear at the hearing with or without counsel; that all witnesses will testify under oath and a stenographic record of the proceeding will be made; that the corporation may produce witnesses and evidence on its own behalf; that the corporation may request issuance of subpoenas to compel attendance of witnesses and production of records relating to the matter under investigation; and that the corporation may cross-examine witnesses and examine evidence produced against it.

**PLEASE TAKE FURTHER NOTICE THAT** interpreter services shall be made available to deaf persons, at no charge, upon written request, within a reasonable time period before the date of any hearing which might be held.

**PLEASE TAKE FURTHER NOTICE THAT** the location at which the hearing will be held is reasonably accessible to persons with a mobility impairment.

DATED:    Buffalo, New York
          March 16, 2021


                              New York State Department of
                              Environmental Conservation


by:        _____
           Teresa J. Mucha
           Associate Attorney
           Region 9
           270 Michigan Avenue
           Buffalo, New York 14203-2915
           (716) 851-7190

STATE OF NEW YORK
DEPARTMENT OF ENVIRONMENTAL CONSERVATION

---

In the Matter of the Violations of Article 19 of the
Environmental Conservation Law and Parts 200 and 201
of Title 6 of the New York State Codes, Rules and
Regulations

**COMPLAINT**

File No. 20-40
R9-20201020-149

-By-

PVS Chemical Solutions, Inc.,

Respondent

---

Staff of the New York State Department of Environmental Conservation allege as follows:

## JURISDICTION AND PARTIES

1.     The New York State Department of Environmental Conservation (the "Department") is an Executive Agency of the State of New York (the "State") with jurisdiction over the environmental policy and programs of the State pursuant to the provisions of the New York State Environmental Conservation Law ("ECL") and Title 6 of the Official Compilation of Codes, Rules and Regulations of the State of New York ("6 NYCRR" or the "Regulations").

2.     The Department's jurisdiction includes, *inter alia*, the abatement and control of air pollution in the State pursuant to the provisions of ECL Article 19 and the regulations promulgated thereunder at 6 NYCRR Part 200, *et seq.*

3.     PVS Chemical Solutions, Inc. ("Respondent") is subject to ECL Article 19 and its implementing regulations found in 6 NYCRR Part 200, *et seq.*

4.     Respondent is an active foreign business corporation created under the laws of Michigan, authorized to do business in the State and a person as defined in ECL 19-0107(1) and 6 NYCRR 200.1(bi).

5.     Respondent owns and operates a facility, located at 55 Lee Street, Buffalo, New York ("Facility") that manufactures all strengths and grades of sulfuric acid and oleum using the contact process.  Other substances produced and stored at the Facility include ammonium thiosulfate and sodium bisulfite.  Raw materials for these processes include molten sulfur, spent sulfuric acid, anhydrous ammonia, sodium hydroxide and sodium carbonate.

6.      Unless otherwise noted, all references herein to any statutes and regulations refer to those statutes and regulations which were in effect for the time period encompassed by this Complaint.

## ENFORCEABLE PROVISIONS OF LAW

7.      The Clean Air Act ("CAA") governs the establishment and revision of National Ambient Air Quality Standards ("NAAQS"). Specifically, 42 U.S.C. 7408 directs the identification and listing of certain air pollutants and the issuance of air quality criteria for those pollutants. 42 U.S.C. 7409 authorizes the promulgation of primary and secondary NAAQS for pollutants for which air quality criteria are issued.

8.      The Environmental Protection Agency ("EPA") sets NAAQS for criteria pollutants, including sulfur dioxide ("$SO_2$"), which are considered harmful to public health and the environment. The CAA requires periodic reviews of the NAAQS. In June 2010, EPA reviewed the $SO_2$ NAAQS and strengthened the primary standard to a level of 75 parts per billion ("ppb"), as the 99 percentile of daily maximum 1-hour $SO_2$ concentrations, averaged over three years. The secondary $SO_2$ standard of 500 ppb evaluated over three hours was not revised. See 75 FR 35520. In April 2019, EPA retained that $SO_2$ standard without revision.

9.      The State was delegated the responsibility to ensure attainment and maintenance of the NAAQS pursuant to a state implementation plan (SIP). EPA approved the State's revisions to its SIP to include the 2010 NAAQS for $SO_2$ in 2017. See 81 FR 95047.

10.      6 NYCRR 200.1(d) defines an air contaminant or air pollutant as a chemical, dust, compound, fume, gas, mist, odor, smoke, vapor, pollen, or any combination of the above.

11.      6 NYCRR 200.1(f) defines an air contamination source or emission source as any apparatus, contrivance, or machine capable of causing the emission of any air contaminant to the outdoor atmosphere, including any appurtenant exhaust system or air cleaning device.

12.      6 NYCRR 200.1(g) defines air pollution as the presence in the outdoor atmosphere of one or more contaminants in quantities, of characteristics and of duration which are or may be injurious to human, plant or animal life or to property or which unreasonably interfere with the comfortable enjoyment of life and property.

13.      Pursuant to 6 NYCRR 200.6, no person shall allow or permit any air contamination source to emit air contaminants which alone or in combination with emissions from other air contamination sources would contravene any applicable ambient air quality standard and/or cause air pollution.

14.     6 NYCRR 200.7 provides that any person who owns or operates an air contamination source which is equipped with an emission control device shall operate such device and keep it in a satisfactory state of maintenance and repair in accordance with ordinary and necessary practices, standards and procedures required to operate such device effectively.

15.     6 NYCRR 201-1.4(a) provides that a facility owner or operator shall take all necessary and appropriate actions to prevent the emission of air pollutants that result in a contravention of any applicable emission standard during periods of start-up, shutdown, or malfunction.  Further, 6 NYCRR 201-1.4(c) states that in the event that emissions of air contaminants in excess of any emission standard occur due to malfunction, the facility owner or operator shall compile and maintain records of the malfunction and notify the Department as soon as possible during normal working hours, but not later than two working days after becoming aware that the malfunction occurred.

16.     6 NYCRR 201-6.4(a)(2) provides that a permittee must comply with all Title V permit conditions.  Any permit non-compliance constitutes a violation of the Clean Air Act and is grounds for enforcement action; for permit termination, revocation and reissuance, or modification; or for denial of a permit renewal application.

17.     6 NYCRR 211.1 provides that no person shall cause or allow emissions of air contaminants to the outdoor atmosphere of such quantity, characteristic or duration which are injurious to human, plant or animal life or to property, or which unreasonably interferes with the comfortable enjoyment of life or property.  This prohibition applies, but is not limited to, any particulate, fume, gas, mist, odor, smoke, vapor, pollen, toxic or deleterious emissions, either alone or in combination with others.

18.     ECL 71-2103 provides that any person who violates Article 19 of the ECL, or any rule or regulation promulgated thereto, shall be liable for a civil penalty of up to $18,000 for each violation and an additional penalty not to exceed $15,000 for each day that the violation continues.  In the case of a second or any further violation, the liability shall be for a penalty not to exceed $26,000 for said violation and an additional penalty not to exceed $22,500 for each day during which such violation continues.

**FACTS**

19.     The Facility is a stationary source, which is defined under the Clean Air Act, 42 USC §7401, et seq., 40 C.F.R. §61.02, ECL 19-0107 and 6 NYCRR 200.1(cd) as any building, structure, facility or installation that emits or may emit any air pollutant. The Facility emits sulfur dioxide ($SO_2$) among other pollutants.

20.     Pursuant to 6 NYCRR 201, the Department issued Respondent Title V Air Permit No. 9-1402-00435/00037, with an effective date of October 2, 2017 and an expiration date of October 1, 2022 ("Permit").

21.     Condition 1 of Respondent's Permit requires compliance with 6 NYCRR 200.6.

22.     Permit Condition 10 requires the proper maintenance of air contamination sources pursuant to 6 NYCRR 200.7.

23.     Condition 21 of Respondent's Permit requires Respondent to assure compliance with the 1-hour $SO_2$ NAAQS and operating its processes within certain parameters outlined in the Permit.

24.     Permit Condition 24 provides that no person shall cause or allow emissions of air contaminants to the outdoor atmosphere of such quantity, characteristic or duration which are injurious to human, plant or animal life or to property, or which unreasonably interfere with the comfortable enjoyment of life or property. Notwithstanding the existence of specific air quality standards or emission limits, this prohibition applies, but is not limited to, any particulate, fume, gas, mist, odor, smoke, vapor, pollen, toxic or deleterious emission, either alone or in combination with others.

25.     Permit Condition 25 requires that the facility owner and/or operator shall physically observe emission point 00005 hourly to monitor for unusual opacity conditions.  If visible emissions above those that are normal and in compliance with 6 NYCRR 212-1.6(a) are detected, the facility owner shall determine the cause immediately and make the necessary correction.  The records of these observations shall be recorded in a log at the facility and shall be available for inspection by Department staff upon request.  Records will be maintained for a period of at least five years.  If visible emissions above those that are normal and in compliance continue to be present after corrections are made, the facility owner will conduct a Method 9 assessment to determine the degree of opacity.

26.     Permit Condition 26 requires that the facility owner and/or operator shall physically observe emission points 00006 and 00007 hourly to monitor for unusual opacity conditions. If visible emissions above those that are normal and in compliance with 6 NYCRR 212-1.6(a) are detected, the facility owner shall determine the cause immediately and make the necessary correction.  The records of these observations will be recorded in a log at the facility and shall be available for inspection by Department staff upon request.  Records will be maintained for at least five years.  If visible emissions above those that are normal and in compliance continue to be present after corrections are made, the facility owner will conduct a Method 9 assessment to determine the degree of opacity.

27.     Permit Condition 44 incorporates the reporting requirement for exceedances of any emission standard that occurs due to a malfunction set forth in 6 NYCRR 201-1.4(c).

28.     Department staff performed a compliance evaluation of the Facility on July 2, 2020 and July 9, 2020 to determine Respondent's compliance with the Permit.

During the inspection, Department staff determined that Respondent was not keeping the requisite records of the visible emissions observations for emission points 00005, 00006 and 00007 as required by Permit Conditions 25 and 26.

29.     Department staffs' review of Respondent's daily log for the prior 18 months showed that readings for emission points 00005 and 00006 were only recorded every other hour and not hourly as required by Permit Conditions 25 and 26.

30.     In addition, Respondent stated during the July 2020 inspection that hourly observations for emission point 00007 were being performed but not recorded in writing as required by Permit Condition 26.

31.     Department staff issued a Notice of Violation ("NOV") dated July 15, 2020 to Respondent for the failure to record the visible emissions observations for emission points 00005, 00006 and 00007 as required by Permit Conditions 25 and 26.

32.     South Buffalo Development, LLC ("South Buffalo Development") owns parcels located at 229 Elk Street and 427 Elk Street near the Facility.  South Buffalo Development created an athletic facility on the property which consists of a multi-use outdoor turf field and fieldhouse on the 427 Elk Street parcel, referred to as the Elk Street Athletic Facility, Buffalo Medaille Sports Complex ("Sports Complex"). Medaille College has been using that property since the spring of 2019.

33.     Department staff have received complaints of odors, smoke, and respiratory and eye irritations by users of the Sports Complex and representatives of South Buffalo Development attributable to emissions from the Facility.

34.     South Buffalo Development advised Department staff that the company brought the smoke and odor complaints to the attention of Respondent.

35.     In response to those complaints, Department staff deployed an ambient air sampling trailer on the adjacent property located to the northeast of the Facility.  The monitoring instrument, calibrator and data logger were set up to record federal equivalent method $SO_2$ monitoring data.

36.     Ambient air sampling commenced on July 10, 2020.  The monitoring measured and recorded ambient $SO_2$ concentrations on an hourly basis through October 18, 2020 except for brief periods of time when the monitor was down for routine maintenance.

37.     Respondent installed four $SO_2$ monitors along the northern fence line of the Facility in between the "Units Building" and the "1&2 Building" to track the $SO_2$ emissions from its operations that traverse its property boundaries.  Respondent advised Department staff that it chose to install the monitors in this area since that is an active portion of the Facility and is near the Sports Complex.

38.     The monitors are placed approximately 15 feet above ground level. Respondent refers to these monitors as Detector 1, Detector 2, Detector 3, and Detector 4.

39.     Respondent's monitors are set to detect $SO_2$ at two alarm levels based on certain government worker safety rules, including the OSHA 8-hour permissible exposure limit for $SO_2$.

40.     The levels referenced above are different than the measurements utilized by the Department's ambient air monitoring station and are not to demonstrate compliance with the $SO_2$ NAAQS.

41.     The NAAQS for $SO_2$ is designed to protect against exposure to sulfur oxides. $SO_2$ is the component of greatest concern in the larger sulfur oxide group and is used as the indicator for that group. Short term exposure to $SO_2$ can harm the human respiratory system and affect breathing.

42.     Since the potential for exposure to $SO_2$ in ambient air is a significant public health importance, EPA strengthened the primary $SO_2$ NAAQS in 2010 to its current standard of 75 ppb for one hour.

43.     From July 10, 2020 through October 18, 2020, the Department's ambient air monitoring station detected 70 exceedances of the 1-hour $SO_2$ NAAQS of 75 ppb from the Facility. That indicates that Respondent has operated in exceedance of the $SO_2$ NAAQS standard 69% of the monitored days.

44.     Respondent was issued a NOV, dated September 2, 2020, for the violation associated with the $SO_2$ NAAQS exceedances that occurred from July 10, 2020 through August 31, 2020.

45.     Respondent was issued a second NOV, dated October 23, 2020, regarding the violation associated with the $SO_2$ NAAQS exceedances that occurred from September 1, 2020 through October 18, 2020.

46.     The October 23, 2020 NOV also cited two additional violations: $SO_2$ leaks from four tanks (Secondary Cooler Drips tank; 410 Tank; a waste acid neutralization tank (referred to as the Waste Tank); and the #3 Dry Tower Pump Tank) and the failure to report a $SO_2$ exceedance associated with a malfunction during the startup of the sodium bisulfite process.

### FIRST CAUSE OF ACTION

47.     Department staff repeats and realleges paragraphs 1 through 46 as if set out at length herein.

48.     Permit Condition 25 requires that the facility owner and/or operator shall physically observe emission point 00005 hourly to monitor for unusual opacity conditions.  If visible emissions above those that are normal and in compliance with 6 NYCRR 212-1.6(a) are detected, the facility owner shall determine the cause immediately and make the necessary correction.  The records of these observations shall be recorded in a log at the facility and shall be available for inspection by Department staff upon request.  Records will be maintained for a period of at least five years.

49.     Permit Condition 26 requires that the facility owner and/or operator shall physically observe emission points 00006 and 00007 hourly to monitor for unusual opacity conditions. If visible emissions above those that are normal and in compliance with 6 NYCRR 212-1.6(a) are detected, the facility owner shall determine the cause immediately and make the necessary correction.  The records of these observations will be recorded in a log at the facility and shall be available for inspection by Department staff upon request.  Records will be maintained for at least five years.

50.     Department staff performed an inspection of the Facility to determine Respondent's compliance with its Permit on July 2, 2020 and July 9, 2020.

51.     During the inspection, Respondent was not able to produce the written records of the hourly visible emission observations for emission points 00005, 00006 and 00007.

52.     Department staff was advised by Respondent during the inspection that it maintains a daily log sheet to record 24-hour readings for two of the three emission points (00005 and 00006) in its main process area control room.   Department staff's review of the archived records for the past 18 months demonstrated that Respondent was only recording visible emission observations every other hour, and not hourly, for emission points 00005 and 00006.

53.     Respondent stated during the inspection that while it is performing the visible emission observations for emission point 00007, it is not recording the observations.

54.     Respondent's failure to properly record in writing the results of the daily visible emissions from emission points 00005, 00006 and 00007 violated Permit Conditions 25 and 26.

## SECOND CAUSE OF ACTION

55.     Department staff repeats and realleges paragraphs 1 through 54 as if set out at length herein.

56.     Respondent generates $SO_2$ by thermally decomposing spent sulfuric acid or by burning elemental sulfur in the presence of excess oxygen and catalytically

converting $SO_2$ to sulfur trioxide which is then absorbed in strong sulfuric acid to produce saleable commercial grades of sulfuric acid and oleum.

57.     PVS has the potential to emit $SO_2$ at a rate greater than 250 tons per year and sulfuric acid mist at a rate greater than 100 tons per year but less than 250 tons per year.

58.     When the Permit was renewed in 2017, a new requirement was added to require the Facility to operate in a manner in compliance with the $SO_2$ NAAQS and 6 NYCRR 200.6.

59.     Specifically, Permit Condition 1 requires compliance with 6 NYCRR 200.6.

60.     Pursuant to 6 NYCRR 200.6, no person shall allow or permit any air contamination source to emit air contaminants which alone or in combination with emissions from other air contamination sources would contravene any applicable ambient air quality standard and/or cause air pollution.

61.     Permit Condition 21 requires Respondent to assure compliance with the 1-hour $SO_2$ NAAQS and operate its processes within certain parameters outlined in the Permit.

62.     As noted in Permit Condition 21, the predominant source, not the only source, of $SO_2$ emissions at the Facility that was known at the time the Permit was renewed in 2017 is the sulfuric acid production process (process 002) which exhausts to a two-stage wet scrubber (emission source 00007).  That scrubber uses an alkaline solution to remove $SO_2$ from the gas stream before being emitted at emission point 00005, which is the vent for that process.

63.     Accordingly, a control requirement was included as part of Permit Condition 21 to operate emission unit 00002 with a minimum scrubber efficiency of 95.56%.

64.     As demonstrated by the $SO_2$ exceedances detected by the Department's ambient air monitoring station, the minimum scrubber efficiency and Respondent's less than 300 tons per day of sulfuric acid production rate are not sufficient controls for the Facility to comply with the $SO_2$ NAAQS, necessitating additional controls and/or operational modifications.

65.     As demonstrated by Respondent's emission statements, and reflected in Respondent's Permit, there are other Facility processes that, at the time the Permit was renewed, contributed 4.1 pounds per hour to the Facility's facility wide $SO_2$ emission rate.

66.     These other known sources of $SO_2$ emissions from the Respondent's operations caused and/or contributed to the $SO_2$ exceedances detected by the Department's ambient air monitoring station.

67.     The known sources are the ammonium thiosulfate and sodium bisulfite processes which emit $SO_2$ from emission points 00160 and 00182, respectively.

68.     Further, there are other $SO_2$ sources at the Facility that were previously unknown to Department staff and not evaluated when the Permit was renewed in 2017.

69.     In 2020, Respondent performed an investigation into potential sources of the $SO_2$ emission NAAQS exceedances detected by the Department's ambient air monitoring station.

70.     Respondent recently admitted that its investigation discovered certain $SO_2$ leaks from its operations at the Facility.

71.     As of the date of the complaint, Respondent discovered $SO_2$ leaks from the Facility's Secondary Cooler Drips tank; a holding and transfer tank referred to as the 410 Tank; a waste acid neutralization tank referred to as the Waste Tank; and the #3 Dry Tower Pump Tank.

72.     The Facility also experienced a malfunction during the startup of the sodium bisulfite process on September 23, 2020 which resulted in a release of $SO_2$ emissions.

73.     In addition to the investigation of potential sources of $SO_2$ emissions at the Facility, Respondent modified its operations to address the $SO_2$ NAAQS exceedances.

74.     In the fall of 2020, Respondent installed a scrubber and ancillary equipment to draw $SO_2$ vapors from Tanks 102 and 103 to capture and neutralize the $SO_2$ vapors from those tanks.  Prior to the installation of the scrubber, Tanks 102 and 103 vented to atmosphere.

75.     As explained in Respondent's Permit modification application for that scrubber, dated October 28, 2020, the purpose of the scrubber installation was "...to address exceedances of the [SO2] NAAQS that are partially associated with $SO_2$ escaping from the storage tank vents..." for Tanks 102 and 103 and tank car handling activities.

76.     The primary $SO_2$ NAAQS is 75 ppb.  The form of that standard is the three-year average of the 99th percentile of the yearly distribution of one hour daily maximum $SO_2$ concentrations.  That represents the fourth highest daily reading for a year.

77.     The fourth highest reading detected by the Department's ambient air monitoring station near the Facility was 371 ppb. Accordingly, should the ambient air monitoring station measure zero $SO_2$ detections from October 19, 2020 through July 9, 2023, the three-year average of $SO_2$ detections from the Facility would still be above the $SO_2$ NAAQs of 75 ppb, resulting in a violation of the $SO_2$ NAAQS.

78.     The Department's ambient air monitoring station demonstrated that Respondent exceeded the $SO_2$ NAAQS on 70 days during the monitoring period of July 10, 2020 through October 18, 2020.

79.     Huntley Steam Generating Station, Tonawanda Coke Corporation and Respondent used to be the top three sources in Erie County for annual SO2 emissions. As noted in the report entitled "40 CFR 51.1205(b) Report; Albany, Bronx, Erie, Kings, New York, Niagara, Orange, Queens, Richmond and Suffolk Counties; Sulfur Dioxide 2010 Primary National Ambient Air Quality Standard; July 2020" ("July 2020 $SO_2$ Report") with the closure of the Huntley Steam Generating Station and Tonawanda Coke Corporation, Respondent is the highest emitter of $SO_2$ in Erie County.

80.     Due to the closure of the Huntley Steam Generating Station and Tonawanda Coke Corporation, the total annual $SO_2$ emissions in Erie County from stationary sources have decreased by an estimated 194 tons in 2019, rendering Erie County as a whole in attainment for $SO_2$ NAAQS as of the date of the July 2020 Report.

81.     Further, with the closure of the Huntley Steam Generating Station and Tonawanda Coke Corporation, there is no other stationary source for the $SO_2$ exceedances detected by the Department's ambient air monitoring station other than Respondent's Facility.

82.     Department staff created a pollution wind rose by using meteorological data from the nearby Buffalo Mesonet site and the $SO_2$ concentrations measured by the Department's ambient air monitoring station located north of and adjacent to the Facility. That wind rose also indicates that the emissions causing the $SO_2$ exceedances are emitted from the Facility.

83.     In addition, the air dispersion modeling performed and submitted for Respondent's Permit renewal in 2017 shows that the maximum impacts from the Facility would be in the vicinity of the location where the Department's ambient air monitoring station was placed.

84.     Lastly, the $SO_2$ leak that occurred on September 23, 2020 when the malfunction occurred during the startup of the sodium bisulfite process was detected by the Department's ambient air monitoring station and triggered an alarm on one of Respondent's fence line $SO_2$ monitors.  That demonstrates that the Department's ambient air monitor is detecting $SO_2$ emissions from Respondent's Facility and not another stationary source in Erie County.

85.     Respondent operated the Facility in a manner that did not maintain ambient impacts of $SO_2$ from its Facility below applicable $SO_2$ NAAQS in violation of 6 NYCRR 200.6 and Permit Conditions 1 and 21.

## THIRD CAUSE OF ACTION

86.     Department staff repeats and realleges paragraphs 1 through 85 as if set out at length herein.

87.     Permit Condition 10 requires the proper maintenance of air contamination sources pursuant to 6 NYCRR 200.7.

88.     6 NYCRR 200.7 provides that any person who owns or operates an air contamination source which is equipped with an emission control device shall operate such device and keep it in a satisfactory state of maintenance and repair in accordance with ordinary and necessary practices, standards and procedures required to operate such device effectively.

89.     As part of its investigation of $SO_2$ fugitive emissions, Respondent detected pipeline penetrations on the Secondary Cooler Drips tank.  Respondent subsequently sealed those penetrations to stop the leak of $SO_2$.

90.     Respondent also discovered pipeline and other penetrations on the 410 Tank.  Respondent subsequently sealed those penetrations to stop the leak of $SO_2$.

91.     Respondent also discovered pipeline and other penetrations on the Waste Tank.  Respondent subsequently sealed those penetrations to stop the leak of $SO_2$.

92.     Respondent also discovered that the seal on the top of the #3 Dry Tower Pump Tank was not sealed properly which allowed $SO_2$ to escape the tank. Respondent advised that it intends to replace the tank and associated piping.

93.     Respondent's failure to properly inspect and maintain the Secondary Cooler Drips tank, 410 Tank, Waste Tank and the #3 Dry Tower Pump Tank to prevent $SO_2$ leaks violated 6 NYCRR 200.7 and Permit Condition 10.

## FOURTH CAUSE OF ACTION

94.     Department staff repeats and realleges paragraphs 1 through 93 as if set out at length herein.

95.     Permit Condition 44 incorporates the reporting requirement for exceedances of any emission standard that occurs due to a malfunction set forth in 6 NYCRR 201-1.4(c).

96.     6 NYCRR 201-1.4(a) provides that a facility owner or operator shall take all necessary and appropriate actions to prevent the emission of air pollutants that result in a contravention of any applicable emission standard during periods of start-up, shutdown, or malfunction. Further, 6 NYCRR 201-1.4(c) states that in the event that emissions of air contaminants in excess of any emission standard occur due to malfunction, the facility owner or operator shall compile and maintain records of the malfunction and notify the Department as soon as possible during normal working hours, but not later than two working days after becoming aware that the malfunction occurred.

97.     Respondent reported to Department staff on October 15, 2020 that at approximately 8:06 a.m. on September 23, 2020, a $SO_2$ value of 6.7 ppm was recorded on Respondent's SO2 monitor Detector 4 which triggered an alarm.

98.     During that time, Respondent advised Department staff that it was starting up the Facility's sodium bisulfite process and raising rates on processes in the plant. Respondent believes that its Decomp Furnace lost suction during that startup which released $SO_2$.

99.     Respondent failed to report to the Department the $SO_2$ release, which constituted a $SO_2$ NAAQS exceedance, associated with the malfunction during the startup of the sodium bisulfite process within two working days of the September 23, 2020 incident in violation of 6 NYCRR 201-1.4 and Permit Condition 44.

## FIFTH CAUSE OF ACTION

100.    Department staff repeats and realleges paragraphs 1 through 99 as if set out at length herein.

101.    The one-hour 75 ppb primary $SO_2$ NAAQS is a health-based standard defining the level of air quality determined to be necessary to protect public health with an adequate margin of safety. Potential adverse impacts from the short-term exposure to $SO_2$ includes respiratory symptoms, such as difficulty breathing, and increased respiratory illness especially those with asthma and other lung impairments.

102.    Employees of Medaille College have filed several complaints regarding odors, smoke, fog, adverse health impacts and the unreasonable interference with their comfortable enjoyment of life or property caused by the emissions the complainants attributed to Respondent for the period of April 2019 through March 2021.

103.    Medaille College Campus Safety Officer Austin submitted to Medaille College submitted to Medaille College an Incident Reporting Form, Report Number 2019-000076, dated April 27, 2019. Officer Austin reported that he observed smoke coming from the chimney stack at the Facility covering the Sports Complex.

104.   Medaille College Assistant Sports Information Director Connor Priester detected a sulfur odor while at the Sports Complex that he attributed to the Facility on March 3, 2019 at approximately 2:00 p.m.  Smoke from the Facility was also observed at that time.

105.   Medaille College Assistant Sports Information Director Connor Priester detected a sulfur odor while at the Sports Complex that he attributed to the Facility on March 4, 2019 at approximately 6:00 p.m.  Smoke from the Facility was also observed at that time

106.   Medaille College Campus Safety Officer Austin submitted to Medaille College a Case Report, Case Number 2019-000077, dated June 7, 2019.  Officer Austin stated that he observed the Sports Complex athletic field covered with smoke from approximately 7:00 p.m. to 9:00 p.m. on May 2, 2019.  He also reported that he left the Sports Complex with a terrible taste in his mouth.

107.   Medaille College Campus Safety Officer Austin submitted to Medaille College a Case Report, Case Number 2019-000079, dated June 7, 2019.  Officer Austin reported that he observed smoke covering the Sports Complex athletic field from approximately 8:00 p.m. until 9:00 p.m. on May 7, 2019.

108.   Medaille College Campus Safety Officer Austin submitted to Medaille College an Incident Report, Report Number 2019-000080, dated May 13, 2019.  Officer Austin reported that he observed smoke coming from a stack at the Facility that covered the Sports Complex throughout his shift on May 13, 2019.  Officer Austin also reported that he left the Sports Complex with a "terrible taste" in his mouth.

109.   Medaille College Campus Safety Officer Austin submitted to Medaille College a Case Report, Case Number 2019-000081, dated June 7, 2019.  Officer Austin reported that attendees at a game at the Sports Complex complained of sulfur odors from the Facility on June 1, 2019.

110.   Medaille College Campus Safety Officer Austin submitted to Medaille College a Case Report, Case Number 2019-000082, dated June 7, 2019.  Officer Austin reports of complaints received of smoke and smog coming from the Facility on June 5, 2019.

111.   Medaille College Campus Safety Officer Austin submitted to Medaille College a Case Report, Case Number 2019-000078, dated June 7, 2019.  Officer Austin reported that he observed smoke or smog from the Facility covering the Sports Complex field on June 6, 2019 at approximately 6:00 p.m.

112.   Medaille College Campus Safety Officer Austin submitted to Medaille College a Case Report, Case Number 2019-000084, dated June 15, 2019.  Officer Austin reported that an individual from Game on Sports complained to him of eye irritation and a sulfur odor on June 15, 2019 at approximately 10:30 a.m.  He also

reported that the smoke from the Facility's smokestack was observed periodically throughout the day on June 15, 2019.

113.    Medaille College Campus Safety Officer Austin submitted to Medaille College a Case Report, Case Number 2019-000097, dated August 18, 2019. Officer Austin reported that smoke or smog periodically covered the Sports Complex athletic field from approximately 3:30 p.m. until 4:30 p.m. on August 18, 2019.

114.    Medaille College Associate Athletic Director Laura Edholm detected an odor while at the Sports Complex that she attributed to the Facility on August 19, 2019 at approximately 4:00 p.m.

115.    Medaille College Associate Athletic Director Laura Edholm detected an odor while at the Sports Complex that she attributed to the Facility on September 4, 2019 at approximately 3:00 p.m.

116.    Medaille College Associate Athletic Director Laura Edholm detected an odor while at the Sports Complex that she attributed to the Facility on September 8, 2019 at approximately 1:00 p.m.

117.    Medaille College Campus Safety Officer Austin submitted to Medaille College a Case Report, Case Number 2019-000105, dated September 10, 2019. Officer Austin reported that Medaille College Coach Craig Wilkinson reported an odor coming onto the playing field from the Facility at approximately 4:00 p.m. on September 10, 2019.

118.    Medaille College Assistant Sports Information Director Connor Priester detected a sulfur odor while at the Sports Complex that he attributed to the Facility on September 11, 2019 at approximately 4:00 p.m.  Smoke from the Facility was also observed at that time.

119.    Medaille College Associate Athletic Director Laura Edholm detected an odor while at the Sports Complex that she attributed to the Facility on September 28, 2019 at approximately 1:00 p.m.

120.    Medaille College Campus Safety Officer Austin submitted to Medaille College an Incident Report, Report Number 2019-000133, dated October 23, 2019. Officer Austin reported that he observed smoke or smog partially cover the Sports Complex athletic field during a Medaille College women's soccer game at approximately 9:30 p.m. on October 23, 2019 and stated that he observed smoke or smog coming from the Facility's smokestack.  He also stated that he experienced a "numb like taste" in his mouth that lingered to the following morning.

121.    Medaille College Assistant Sports Information Director Connor Priester detected a sulfur odor while at the Sports Complex that he attributed to the Facility on

November 6, 2019 at approximately 4:00 p.m.  Smoke from the Facility was also observed at that time.

122.    Medaille College Assistant Sports Information Director Connor Priester detected a sulfur odor while at the Sports Complex that he attributed to the Facility on November 9, 2019 at approximately 2:00 p.m.  Smoke from the Facility was also observed at that time

123.    Medaille College Campus Safety Officer Allerton submitted to Medaille College an Incident Report, Report Number 2020-000023, dated February 10, 2020. The Incident Report states that at approximately 4:30 p.m. on February 10, 2020, that strong odor of sulfur was detected outside the Sports Complex and that the Facility smokestacks were emitting "grey/white clouds of smoke."

124.    Medaille College Campus Safety Officer Yung submitted to Medaille College a Case Report, Case Number 2020-000037, dated March 4, 2020.  The Incident Report states that Medaille College Men's Lacrosse Coach Dan Patrone reported that he smelled sulfur at the Sports Complex and surrounding area at approximately 3:00 p.m. on March 4, 2020.  The Incident Report states that Officer Yung confirmed the odor.

125.    Medaille College Campus Safety Officer Allerton submitted to Medaille College an Incident Report, Report Number 2020-000035, dated March 10, 2020.  The Incident Report states that Officer Allerton detected a strong odor of sulfur at the Sports Complex at approximately 3:50 p.m. on March 10, 2020.  Officer Allerton observed "grey-white smoke" emitted from the Facility's smoke stacks.

126.    Medaille College Campus Safety Officer Allerton submitted to Medaille College an Incident Report, Report Number 2020-000042, dated March 13, 2020.  The Incident Report states that Officer Allerton detected a sulfur smell at the Sports Complex at approximately 9:00 a.m. on March 13, 2020.  Officer Allerton stated that he observed "dark grey smoke" emitted from the Facility's smokestack.

127.    The Incident Report referenced in paragraph 125 above also states that Brenda Dean told Officer Allerton that she smelled sulfur around the Sports Complex and saw light colored smoke coming from the Facility's smokestack.

128.    Medaille College Campus Safety Officer Allerton submitted to Medaille College a Medaille College Incident Reporting Form ("Incident Report"), Report Number 2020-000107, dated November 15, 2020.  Officer Allerton reported that he detected a strong burning rubber type odor at approximately 2:00 p.m. on November 13, 2020 at the Sports Complex.  He also reported that he observed grey smoke from the Facility.

129.    Medaille College Head Women's Lacrosse Coach, Erin Schurr, submitted to Medaille College a Medaille College Reporting Form, Report Number IR00000771,

reporting that she detected a sulfur odor while exiting the Administrative Building at the Sports Complex on March 9, 2021 at approximately 4:45 p.m.

130.     Medaille College Campus Safety Officer Brassard submitted to Medaille College a Medaille College Reporting Form, Report Number 2021-000022 and IR00000770, dated March 10, 2021. Officer Brassard reported that a complaint was received at approximately 4:57 p.m. on March 9, 2021 of a sulfur odor attributable to the Facility. The report also states that Public Safety Officer McCarthy was on site an confirmed the sulfur odor.

131.     Medaille College Campus Athletic Trainer Brenda Dean submitted to Medaille College a Medaille College Reporting Form, IR00000774, reporting that she detected a sulfur odor intermittently on March 9, 2021 from approximately 2:00 p.m. through 10:45 p.m. for the Medaille College's men's soccer, men's lacrosse and women's soccer practices. Ms. Dean also reported that the stacks from the Facility were emitting a white smoke that blew towards the Sports Complex intermittently. Ms. Dean reported observing a noticeable fog on the field and in the field lighting.

132.     Department staff have also received numerous complaints from representatives of the property owner, South Buffalo Development, for the period of January 2019 through March 2021 of smoke, fog, odors and the unreasonable interference with the comfortable use of the company's property that the company attributes to the Facility's emissions.

133.     Department staff periodically perform odor surveys in the vicinity of the Facility to determine the presence of odors at off-site areas adjacent to the Facility, including at the Sports Complex.

134.     Department staff also perform odor surveys of the Facility upon receipt of certain odor complaints attributable to the Facility.

135.     On November 17, 2020, Department staff detected a sulfur odor attributable to the Facility on Orlando Street at approximately 5:40 p.m.

136.     On November 19, 2020, Department staff detected a sulfur odor attributable to the Facility at (a) Orlando Street, (b) east side of 343 Elk Street, Armor Electric Motor & Crane Services building, and (c) north end of the Sports Complex athletic field between the goal net and east corner of the fence around the field at approximately 1:02 p.m.

137.     On November 23, 2020, Department staff detected a sulfur odor along the fence line between the Facility and the Sports Complex athletic field at approximately 2:11 p.m.

138.     On November 30, 2020, Department staff detected a sulfur odor attributable to the Facility on South Park Avenue at approximately 12:55 p.m.

139.    On December 1, 2020, Department staff detected a sulfur odor attributable to the Facility on Orlando Street at approximately 9:00 a.m.

140.    On December 7, 2020, Department staff detected a sulfur odor attributable to the Facility on South Park Avenue at approximately 2:45 p.m.

141.    On December 14, 2020, Mr. Williams sent an email to Department staff to report the observation of visible emissions coming from the Facility at approximately 8:16 a.m.  Mr. Williams also advised that electricians working at the Sports Complex detected odors when the wind shifted, and the visible emissions shifted to the athletic field.  Mr. Williams advised that the electricians explained that they had to come down from the man-lifts since they were not able to catch their breath.

142.    On December 14, 2020, Department staff performed an odor survey in response to the complaint and detected sulfur odors attributable to the Facility while in the vicinity of the Facility's Lee Street parking lot at approximately 8:51 a.m.

143.    On December 31, 2020, Mr. Williams sent an email to Department staff to advise of strong odors detected by the property owner's security guard at approximately 8:15 p.m. on that date which were attributed to the Facility.  Mr. Williams reported to Department staff that the odors caused him to cough after approximately 5 minutes outside of his car at approximately 8:50 p.m. on December 31, 2020.

144.    On December 31, 2020, Department staff performed an odor survey in response to the complaint and detected a sulfur odor attributable to the Facility on Orlando Street at approximately 9:37 a.m.

145.    On January 5, 2021, Department staff detected a sulfur odor attributable to the Facility on South Park Avenue at approximately 4:30 p.m.

146.    On January 11, 2021, Department staff detected a sulfur odor attributable to the Facility between the PVS fence and Sport Complex fence at approximately 1:14 p.m.

147.    On January 19, 2021, Department staff detected a sulfur odor attributable to the Facility on Orlando Street at approximately 8:42 a.m.

148.    On January 25, 2021, Department staff detected a sulfur odor attributable to the Facility while in the vicinity of the Facility and Sports Complex athletic field at approximately 10:25 a.m.

149.    On January 26, 2021, Department staff detected a sulfur odor attributable to the Facility at Lee Street and South Park Avenue at approximately 8:30 a.m.

150.    On February 1, 2021, Department staff detected a sulfur odor attributable to the Facility on South Park Avenue at approximately 3:25 p.m.

151.    On February 2, 2021, Department staff detected a sulfur odor attributable to the Facility on South Park Avenue at approximately 11:30 a.m.

152.    On February 4, 20201, Department staff detected a sulfur odor attributable to the Facility on Elk Street at approximately 8:45 a.m.

153.    On February 8, 2021, Department staff detected a sulfur odor attributable to the Facility on Prenatt Street at approximately 3:30 p.m.

154.    On February 16, 2021, Department staff detected a sulfur odor attributable to the Facility on South Park Avenue at approximately 9:09 a.m.

155.    On February 22, 2021, Department staff detected a sulfur odor attributable to the Facility on Orlando Street and Prenatt Street at approximately 2:55 p.m.

156.    On February 23, 2021, Department staff detected a sulfur odor attributable to the Facility on Elk Street at approximately 9:10 a.m.

157.    On February 25, 2021, Department staff received an odor complaint from Tess Williams of a sulfur odor at the Sports Complex attributable to the Facility.

158.    Department staff surveyed the area adjacent to the Facility and Sports Complex on February 25, 2021 and detected intermittent sulfur odors at approximately 8:36 a.m. and between 3:00 and 4:00 p.m.  The sulfur odors detected in the afternoon were from around the field house at the Sports Complex and along the Facility's fence near the #3 Dry Tower Pump Tank that Respondent previously identified as leaking and emitting $SO_2$ emissions.

159.    On February 26, 2021, Department staff received an odor complaint from Tess Williams of a sulfur odor at the Sports Complex attributable to the Facility.

160.    Department staff surveyed the area adjacent to the Facility and Sports Complex on February 26, 2021 and detected intermittent sulfur odors from approximately 10:15 a.m. through 12:00 p.m. on Prenatt Street and at the Sports Complex.

161.    On February 27, 2021, Department staff received a complaint of sulfur odors at the Sports Complex and that the Facility's stack emissions were falling onto the soccer field at the Sports Complex.

162.    On February 28, 2021, Department staff received a complaint of sulfur odors in the old power plant building near the Facility and at near the Sports Complex that are attributable to the Facility.

163.   On March 8, 2021, Department staff detected a sulfur odor attributable to the Facility on Prenatt Street and Orlando Street at approximately 2:45 p.m.

164.   On March 9, 2021, Department staff detected a sulfur odor attributable to the Facility on Elk Street at approximately 6:20 p.m.

165.   Based on the data provided by Respondent, it's $SO_2$ fence line monitors detected $SO_2$ on at least 108 days from September 2, 2020 through January 1, 2021.

166.   Respondent's data also demonstrated that it's monitors recorded several instances where $SO_2$ emissions were detected multiple times over the course of one day.

167.   Respondent's $SO_2$ fence line monitors also detected $SO_2$ on 55 days, during the period of September 2, 2020 through February 28, 2021, that correspond with dates when complaints of sulfur odors attributable to the Facility were made, and/or sulfur odors were detected by Department staff as part of their odor investigations, and/or $SO_2$ emissions were detected by the Department's ambient air monitoring station.  Those instances are outlined in the chart below.

| Date $SO_2$ Detected by Respondent's Monitors | Additional $SO_2$ Detections that Correspond with the Respondent's $SO_2$ Monitors |
|---|---|
| 9/2/20 | Department monitoring station |
| 9/3/20 | Department monitoring station |
| 9/4/20 | Department monitoring station |
| 9/5/20 | Department monitoring station |
| 9/6/20 | Department monitoring station |
| 9/7/20 | Department monitoring station |
| 9/8/20 | Department monitoring station |
| 9/9/20 | Department monitoring station |
| 9/10/20 | Department monitoring station |
| 9/11/20 | Department monitoring station |
| 9/12/20 | Department monitoring station |
| 9/13/20 | Department monitoring station |
| 9/14/20 | Department monitoring station |
| 9/15/20 | Department monitoring station |
| 9/16/20 | Department monitoring station |
| 9/17/20 | Department monitoring station |
| 9/18/20 | Department monitoring station |
| 9/19/20 | Department monitoring station |
| 9/21/20 | Department monitoring station |
| 9/22/20 | Department monitoring station |
| 9/23/20 | Odor complaint; Department monitoring station |

| Date SO$_2$ Detected by Respondent's Monitors | Additional SO$_2$ Detections that Correspond with the Respondent's SO$_2$ Monitors |
|---|---|
| 9/24/20 | Department monitoring station |
| 9/25/20 | Department monitoring station |
| 9/26/20 | Department monitoring station |
| 9/27/20 | Department monitoring station |
| 9/28/20 | Department monitoring station |
| 9/29/20 | Department monitoring station |
| 9/30/20 | Department monitoring station |
| 10/1/20 | Department monitoring station |
| 10/2/20 | Department monitoring station |
| 10/3/20 | Department monitoring station |
| 10/4/20 | Department monitoring station |
| 10/5/20 | Department monitoring station |
| 10/6/20 | Department monitoring station |
| 10/7/20 | Department monitoring station |
| 10/8/20 | Department monitoring station |
| 10/9/20 | Department monitoring station |
| 10/10/20 | Department monitoring station |
| 10/12/20 | Department monitoring station |
| 10/13/20 | Department monitoring station |
| 10/14/20 | Department monitoring station |
| 10/15/20 | Department monitoring station |
| 16/16/20 | Department monitoring station |
| 10/17/20 | Department monitoring station |
| 10/18/20 | Department monitoring station |
| 11/6/20 | Odor complaint |
| 11/13/20 | Odor complaint |
| 11/17/20 | Department staff detection |
| 11/19/20 | Department staff detection |
| 11/23/20 | Department staff detection |
| 11/30/20 | Department staff detection |
| 12/14/20 | Department staff detection; odor complaint |
| 12/23/20 | Odor complaint |
| 12/31/20 | Odor complaint |
| 2/27/21 | Odor complaint; Department staff detection |

168.    Respondent operated and continues to operate the Facility in a manner that causes a public nuisance in violation of 6 NYCRR 211.1 and Permit Condition 24.

## SIXTH CAUSE OF ACTION

169.   Department staff repeats and realleges paragraphs 1 through 168 as if set out at length herein.

170.   6 NYCRR 201-6.4(a)(2) provides that a permittee must comply with all Title V permit conditions.  Any permit non-compliance constitutes a violation of the Clean Air Act and is grounds for enforcement action; for permit termination, revocation and reissuance, or modification; or for denial of a permit renewal application.

171.   Respondent is in violation of 6 NYCRR 201-6.4(a)(2) for its failure to comply with Permit Conditions 1, 10, 21, 24, 25 and 26 and 44, as outlined in the first to fifth causes of action outlined above.

**NOW**, having considered this matter and being duly advised, **IT IS ORDERED THAT**:

**WHEREFORE**, the Department respectfully requests an Order:

I.     Finding Respondent in violation of the cited statutes, regulations, and Permit.

II.    Directing Respondent to pay a civil penalty in the amount of $400,000.

III.   Directing Respondent to perform the following corrective actions outlined in the attached Appendix A by the deadlines provided.

IV.    For such other and further relief as may be just, proper, and appropriate.

DATED:     Buffalo, New York
           March 16, 2021

New York State Department of
Environmental Conservation

Teresa J. Mucha
Associate Attorney
Region 9
270 Michigan Avenue
Buffalo, New York 14203-2999
(716) 851-7190

## Appendix A

## COMPLIANCE SCHEDULE

## PVS CHEMICAL SOLUTIONS, INC.
### Case No. R9-20201020-149

| MILESTONE | COMPLETION DATE |
|---|---|
| 1. Develop an odor mitigation plan to evaluate methods to capture and prevent emissions during the unloading and storage of molten sulfur at the Facility. At a minimum, this plan shall include (i) an ambient air monitoring plan for hydrogen sulfide emissions, including, but not limited to, an evaluation of the installation of continuous perimeter fence line monitors; (ii) a description of any actions taken to date by Respondent to eliminate or mitigate odors associated with the unloading and storage of molten sulfur; (iii) a plan to prevent and eliminate hydrogen sulfide emissions and reduce sulfur emissions; and (iv) an evaluation of operational modifications for future unloading and storage of molten sulfur. | Within 30 days of a Commissioner's Order. |
| 2. Develop a plan to control emissions from Tank 113 which is used to store spent sulfuric acid and currently vents to the atmosphere. | Within 30 days of a Commissioner's Order. |
| 3. Evaluate whether the High Purity Sulfuric Acid process (emission unit 00040) is a potential source of $SO_2$ emissions. Submit a written report of the findings of the evaluation and options to capture and prevent $SO_2$ emissions if that process is determined to be a source of $SO_2$ emissions. | Within 30 days of a Commissioner's Order. |
| 4. Test and replenish the catalyst in the Unit #4 converter. | Within 30 days of a Commissioner's Order. |
| 5. Conduct an emissions test to measure $SO_2$, sulfur trioxide, sulfuric acid mist and opacity from emission point 00160 & 00182 in accordance with an approved stack test protocol. Submit an emission testing protocol at least 30 days before the scheduled test. Submit a stack test report within 60 days of the completion of the stack test. | Within 60 days of a Commissioner's Order. |
| 6. Retain an independent third party to perform a U.S. Environmental Protection Agency Method | Within 45 days of a Commissioner's Order. |

| MILESTONE | COMPLETION DATE |
|---|---|
| 9 Visible Emission Observation ("VEO") of the main stack (EP 00005) for 30 minutes on a daily basis. Submit a monthly report to the Department by the 10th day of the following month containing, at a minimum, the following information:<br>a. The VEO results;<br>b. All information describing the cause of any deviation associated with the opacity exceedance(s) during that time period; and<br>c. Any investigative and/or corrective actions taken in response to an opacity deviation | |
| 7. Investigate the cause(s) of visible emissions from all sulfuric acid production emission sources and evaluate options to eliminate the visible emissions. The evaluation must include, but is not limited to (i) an evaluation of the installation of a continuous emissions monitoring system (CEM) for $SO_2$ and $H2S04$ mist, (ii) an evaluation of the installation of a continuous opacity monitoring system (COM); (iii) the use of additional mist eliminators and scrubbers, (iv) a system tightness evaluation with an ongoing repair program to identify ambient air leaks into the dry process gas stream, (v) raising the height of the stack (EP 00005) and (vi) a program/schedule to implement any measures that PVS identifies during the investigation to eliminate opacity exceedances. | Commence investigation within 30 days of a Commissioner's Order. Submit a report of the findings of the evaluation and suggested proposal(s), with an implementation schedule, within 45 days of the start of the investigation. Monthly status reports of the investigation and corrective action implementation shall be submitted by the 30th of each month until implementation of the corrective actions is complete. |
| 8. Submit copies of any Standard Operating Procedures, reports, protocols, best practices, or other documentation developed by PVS outlining the actions for employees to follow to minimize emissions during periods of equipment maintenance and start-up, shutdown, or malfunction activities. | Within 45 days of a Commissioner's Order. |
| 9. Submit the raw data from the company's fence line $SO_2$ monitors since October 15, 2020. The submission shall also include an explanation for any high readings, actions taken by the company in response and records that include date and time. | Within 30 days of a Commissioner's Order. Future data shall be submitted on a quarterly basis following the initial submission. |
| 10. Complete the fabrication and installation of the redesigned #3 Dry Tower Pump Tank as | Within 30 days of a Commissioner's Order. |

| MILESTONE | COMPLETION DATE |
|---|---|
| described in your September 30, 2020, letter to Mr. Michael Emery. | |
| 11. Submit an updated Facility wide emission inventory. | Within 45 days of a Commissioner's Order. |
| 12. Retain an independent third party to perform a leak detection evaluation of Facility equipment that may be a source of SO2 emissions. Submit a report of the findings within 30 days of completion of the evaluation. | Within 45 days of a Commissioners Order. |
| 13. Establish an odor hotline for members of the community to report odors perceived to be emanating from the Facility to a representative of the Facility for prompt investigation and performance of any requisite corrective actions. The complaints shall be recorded in a written document to be retained by Respondent. A copy of the document shall be submitted to the Department every two weeks. | Within 30 days of a Commissioner's Order. |
| 14. Submit a Standard Operating Plan or Master Maintenance Plan to document standard and/or routine maintenance that is required at the Facility. | Within 45 days of a Commissioner's Order. |
| 15. Submit a copy of all reports, memoranda, emails or other communication, including but not limited to Safety and Environmental Notes and Operation and Maintenance Notes, regarding the leak repairs performed since January 2019 to the date of the Complaint and the corrective actions performed in response to the detected leaks. | Within 45 days of Commissioner's Order. |
| 16. Install a minimum of four additional monitors to detect for SO$_2$ along the fence line between the Units Building and the western side of Tanks 102 and 103. | Within 30 days of Commissioner's Order. |

# EXHIBIT B

**NEW YORK STATE DEPARTMENT OF ENVIRONMENTAL CONSERVATION**

**Office of the General Counsel**
625 Broadway, 14th Floor, Albany, New York 12233-1500
P: (518) 402-9185 | F: (518) 402-9018
www.dec.ny.gov

May 14, 2021

**VIA ELECTRONIC MAIL**

Robert Davis
Plant Manager
PVS Chemical Solutions, Inc.
55 Elk Street
Buffalo, New York 14210

Dear Robert Davis:

> **TEMPORARY CEASE AND DESIST**
> **PVS Chemical Solutions, Inc.**
> **Air Title V Facility Permit**
> **9-1402-00435/00037**

The New York State Department of Environmental Conservation ("DEC") hereby demands PVS Chemical Solutions, Inc. immediately cease and desist ongoing operations at its facility located at 55 Elk Street, in the City of Buffalo unless and until the facility is able to undertake operational modifications and/or production level reductions to operate in a manner that does not violate the Acute Exposure Guideline Levels ("AEGLs") for sulfur dioxide ("$SO_2$") and does not otherwise cause or contribute to air pollution related to $SO_2$ emissions that may cause a risk to human health.

As you are aware, DEC redeployed the ambient air monitoring station on March 31, 2021 adjacent to the PVS Chemical Solutions, Inc. facility which has detected numerous exceedances of the $SO_2$ National Ambient Air Quality Standard ("NAAQS") primary standard. In addition, the New York State Department of Health ("DOH") has reviewed the 2020 and 2021 ambient air monitoring data and detected numerous instances where the results exceeded the $SO_2$ AEGLs set by the National Academy of Sciences, including instances when the AEGL-2 level was exceeded indicating the potential for more severe respiratory effects.

DOH's review of the $SO_2$ monitoring data found exceedances of additional health-based air standards, including the 1-hour NAAQS and the Environmental Protection Agency's thresholds of concern for triggering Air Quality Index warnings of unhealthy air. The number and duration of these unhealthy air episodes is of particular risk to exercising individuals and to other vulnerable groups including asthmatics. This indicates that symptoms of irritation, reduced lung function and respiratory distress can be expected for these and other individuals not in the vulnerable groups at the detected concentrations. This finding is consistent with the reported complaints received by DEC from those using the nearby athletic field.



Accordingly, due to the potential public health impacts associated with the $SO_2$ emissions, DOH has directed the cessation of activities at the Elk Street Athletic Facility, Buffalo Medaille Sports Complex until the potential public health risks caused by PVS Chemical Solutions, Inc. are fully addressed or abated.

Should PVS Chemical Solutions, Inc. fail to comply with this cease and desist demand, by immediately ceasing operations until it provides and implements a compliance plan that demonstrates, to DEC's satisfaction, PVS Chemical Solutions, Inc.'s ability to operate without exceeding the $SO_2$ AEGLs or otherwise causing or contributing to air pollution related to $SO_2$ emissions that may cause a risk to human health, the State of New York will pursue all other available enforcement options.  Such options include, but are not limited to, a preliminary injunction brought by the New York State Attorney General's office or a summary abatement order filed pursuant to Environmental Conservation Law Section 71-0301 or an order for summary action pursuant to Public Health Law Section 16 for the immediate closure of the facility.

Please have your counsel contact the undersigned should you have any questions or wish to discuss this demand further.

Very truly yours,

Thomas Berkman
Deputy Commissioner and
General Counsel

ec:   David Roach, Esq.
      J. Michael Lennon, Esq.
      Basil Seggos, DEC Commissioner
      Sean Mahar, Chief of Staff
      J. Jared Snyder, Deputy Commissioner for Climate, Air and Energy
      Dr. Howard Zucker, DOH Commissioner
      Lisa Pino, DOH Executive Deputy Commissioner
      Kathy Marks, DOH General Counsel
      Michael G. Bass, Esq., DOH Deputy Counsel
      Lemuel Srolovic, Esq., NYS Attorney General's Office, Environmental Protection Bureau
      Lisa Burianek, Esq., NYS Attorney General's Office, Deputy Bureau Chief, Environmental Protection Bureau
      Eric Schaaf, Esq., Environmental Protection Agency
      Terri Mucha, Esq., DEC Associate Attorney

# EXHIBIT

# C

Case 1.21-cv-00652-JLS-JJM Document 1-3 Filed 05/20/21 Page 59 of 64

https://buffalonews.com/news/local/buffalo-chemical-plant-says-state-shutdown-order-is-not-justified/article_0324dfae-b5ca-11eb-9a4c-57c0392d0fa5.html

# Buffalo chemical plant says state shutdown order 'is not justified'

Dale Anderson

May 15, 2021



Chemical storage tanks at PVS Chemical Solutions on the bank of the Buffalo River.

Derek Gee/News file photo

Dale Anderson

Representatives for a Buffalo chemical plant contend that a shutdown order Saturday from the State Department of Environmental Conservation and the State Department of Health "is not justified in any way."

The state agencies have directed PVS Chemical Solutions to immediately cease operations at its plant on Lee Street in the Seneca-Babcock neighborhood due to excessive emissions of sulfur dioxide.

In a news release Saturday, the DEC said high sulfur dioxide levels were found at the nearby athletic field at the Medaille College Sports Complex at Buffalo Color Park on Elk Street.

The DEC release said that PVS has been directed to shut down until the company can show that its operations do not pose a health threat.

"Until PVS can prove it can operate without emitting potentially harmful $SO_2$ into this community, either by altering operations or scaling back production, it should remain shuttered," DEC Commissioner Basil Seggos said in the release.

In a statement to the press, PVS representatives said the plant has safely processed sulfuric acid for 40 years.

"We were in discussions with the DEC as late as this past Friday and we were given no indication that this action was forthcoming," the company's statement said. "We are in complete disagreement with it."

The company said it "will tone down operations while we work with the DEC through the courts to remedy this situation."

The company noted that the plant employs 49 workers, 37 of them United Steel Workers union members, and that the ultra-pure sulfuric acid that it makes is vital to the production of semiconductors.

According to the DEC release, complaints about odors led the DEC to park an air monitoring trailer next to the athletic facility last year to sample for $SO_2$.

The DEC issued notices of violation last year and began an administrative enforcement action in March. More sampling in April again showed excess $SO_2$ levels, the DEC said, posing a health risk to asthmatics and people exercising.

Case 1.21-cv-00623 Document-1 Filed 08/20/21 Page 61 of 64

## Dale Anderson

Reporter

Dale Anderson has been a Buffalo News staff reporter since 1968. He was the chief rock and pop writer for 20 years and helped establish the weekend entertainment magazine Gusto.

# EXHIBIT
# D



**ANDREW M. CUOMO**
Governor

**HOWARD A. ZUCKER, M.D., J.D.**
Commissioner

**LISA J. PINO, M.A., J.D.**
Executive Deputy Commissioner

May 15, 2021

Kenneth M. Macur, President
Medaille College
18 Agassiz Circle
Buffalo, NY 14214

RE:  Temporary Suspension of Activities at Elk Street Athletic Facility,
Buffalo Medaille Sports Complex

Dear President Macur:

The New York State Departments of Health and Environmental Conservation (DOH, DEC) request that all activities at the Elk Street Athletic Facility, administered by Medaille College, be suspended and the fields secured to prevent further use, effective immediately. As explained in further detail below, continued use of the athletic facility constitutes a danger to the health of the people, in violation of Public Health Law § 16, and must be suspended until such time as all hazards can be mitigated.

Air monitoring data taken from the soccer field at the Elk Street Athletic Facility indicates numerous episodes of elevated sulfur dioxide ($SO_2$) concentrations at that location which are unsafe for the public to be exposed to while exercising even for relatively brief periods. Further, a DEC air monitoring station at the Elk Street Athletic Facility soccer field indicates that $SO_2$ concentrations frequently exceed the National Ambient Air Quality Standard primary standard set by the U.S. Environmental Protection Agency (USEPA), Acute Exposure Guideline Levels (AEGLs), and exceed the thresholds used by USEPA's Air Quality Index that indicate unhealthy air quality. In several instances, measured $SO_2$ at the soccer field has exceeded the AEGL-2 level which indicates the potential for more severe respiratory effects. The most vulnerable groups are asthmatics and those who are exercising, although any member of the general public may be affected at the measured concentrations.

In light of this monitoring data, it is critical that all activities at the Elk Street Athletic Facility be temporarily suspended until offsite sources of $SO_2$ concentrations are mitigated and adverse impacts on the air quality at your athletic facility are reversed. DEC is taking aggressive action to address the source of the $SO_2$ contamination and to make sure that necessary repairs and solutions occur on a highly expedited time frame and will keep you apprised as these efforts progress and air quality in the area has improved. Should activities continue at the facility, DOH and DEC reserve the right to pursue all available legal and administrative remedies, including summary action pursuant to Section 16 of the New York State Public Health Law.

Case 1:21-cv-00662-JLS   Document 1-2   Filed 05/23/21   Page 64 of 64

We greatly appreciate your cooperation in addressing this situation and look forward to working with you to protect public health and the health of all those who utilize your facility. Please do not hesitate to contact Michael Bass at (518) 396-7040 if you have any questions or concerns.

Sincerely

Howard A. Zucker, M.D., J.D
Commissioner
Department of Health

Basil Seggos
Commissioner
Department of Environmental Conservation

Cc:     Sean Mahar, Chief of Staff
        J. Jared Snyder, Deputy Commissioner for Climate, Air and Energy
        Thomas Berkman, DEC Deputy Commissioner and General Counsel
        Lisa Pino, DOH Executive Deputy Commissioner
        Kathy Marks, DOH General Counsel
        Michael G. Bass, Esq., DOH Deputy Counsel
        Lemuel Srolovic, Esq., NYS Attorney General's Office, Environmental Protection Bureau
        Lisa Burianek, Esq., NYS Attorney General's Office, Deputy Bureau Chief, Environmental Protection Bureau
        Eric Schaaf, Esq., Environmental Protection Agency
        Terri Mucha, Esq., DEC Associate Attorney